UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X
INVENTORY GENERATION INC. D/B/A
COAST TO COAST DISPATCH and
EARL DAVID, individually and on behalf of all of          Civ. A. No. 1:22-cv-10529
those similarly situated,

                                  Plaintiffs,

                                        **JURY TRIAL DEMANDED**

        -vs-

SILVERLINE SERVICES INC., SHMUEL BRUMMEL,
PROVENTURE CAPITAL FUNDING LLC,
BENJAMIN ARYEH;
WYNWOOD CAPITAL GROUP LLC, ZALMEN
TEITELBAUM, SAM GROSS;
GLOBEX FUNDING LLC, JACK BROWN;
MCA RECEIVABLES, LLC D/B/A UNITED FUND USA,
YISROEL C. GETTER; JOHN DOES 1-10; and
JOHN DOE INVESTORS 1-10,
                              Defendants.
---------------------------------------------------------------------X

## CLASS ACTION COMPLAINT

      Plaintiffs INVENTORY GENERATION INC. D/B/A COAST TO COAST DISPATCH

and EARL DAVID (collectively "Plaintiffs"), individually and on behalf of all those similarly

situated, as and for their Complaint against SILVERLINE SERVICES INC., SHMUEL

BRUMMEL; PROVENTURE CAPITAL FUNDING LLC, BENJAMIN ARYEH; WYNWOOD

CAPITAL GROUP LLC, ZALMEN TEITELBAUM, SAM GROSS; GLOBEX FUNDING

LLC, JACK BROWN; MCA RECEIVABLES, LLC D/B/A UNITED FUND USA, YISROEL

C. GETTER (collectively "Defendants"), state as a follows:

## NATURE OF THE ACTION

      1.      This is a class action against several merchant cash advance ("MCA") companies

that are controlled and manipulated, respectively, by the individual Defendants to carry out

fraudulent schemes to collect upon unlawful debts and otherwise fraudulently obtain funds from Plaintiffs and hundreds of other similarly situated victims through the use of their sham MCA agreements as further defined below ("MCA Agreements").

2.      Unfortunately, the type of conduct by Defendants here is a ballooning national problem that has raised the attention of both state and federal regulators.

3.      In November 2018, Bloomberg News and renowned journalist Bethany McLean (of Vanity Fair acclaim) published what would be the first in a series of groundbreaking news articles exposing the abuses of the MCA industry, and its use of confessions of judgments to seize out-of-state bank accounts.[1]

4.      The New York Legislature quickly took action, banning the use of out-of-state confessions of judgment in September 2019.  In support, the Legislature cited Bloomberg News.

5.      More recently, on February 10, 2022, Bloomberg News exposed a new tactic being abused by the predatory MCA industry, and in particular, at least one group of the Defendants here.

6.      Specifically, predatory MCA operators operate out of New York but abuse an apparent loophole under Connecticut procedural law to collect upon their unlawful debts. In doing so, the operators freeze out-of-state bank accounts by simply serving legal papers (which have not been reviewed or scrutinized by any court) on a bank that has a branch located in Connecticut. As justification for their bank freezes, the operators represent and attest under oath that their small business victims owe them a debt and that the operators are unaware of any defenses to their claims.

7.      According to Bloomberg News, this Connecticut loophole was used more than

---

[1] https://www.yahoo.com/entertainment/merchant-cash-advances-salvation-small-businesses-payday-lending-reincarnate-161835117.html; https://www.bloomberg.com/confessions-of-judgment

180 times just last year. The result of this tactic is often catastrophic because the operators can freeze out-of-state bank accounts without any notice whatsoever. Once frozen, the operators can then extort payment under duress due to their victims' need to save payroll or pay other necessary business expenses, such as insurance, taxes, rent and inventory.

8.     This tactic is especially harsh because even when the small business victim capitulates to the operator's extortionate demands, it is often too late because the release of those bank accounts may take days to unfreeze due to the processing delays and procedural constraints of individual banks and their levy departments.

9.     This in fact has occurred with Plaintiffs as it relates to Defendants MCA RECEIVABLES, LLC D/B/A UNITED FUND USA, and YISROEL C. GETTER, who recently levied against Plaintiffs' accounts without any notice whatsoever, creating catastrophic harm for Plaintiffs.

10.    In doing so, Defendants MCA RECEIVABLES, LLC D/B/A UNITED FUND USA, and YISROEL C. GETTER violated 42 U.S.C. § 1983 by violating Plaintiffs' Fourteenth Amendment right to Due Process under the color of Connecticut state law. Among these intentional violations of due process, Defendants, like here, knowingly and purposely issue Prejudgment Writs of Attachment to third-party banks without first filing a complaint in state court, and without serving notice. Instead, Defendants require Plaintiffs to execute form contracts of adhesion waiving their rights to a hearing, while at the same time agreeing to the jurisdiction of two different states, Connecticut and New York. Thus, the first notice received by Plaintiffs is when their bank accounts become frozen.

11.    Plaintiffs here are representatives of Defendants' unlawful lending practices.

12.    Plaintiff INVENTORY GENERATION INC. D/B/A COAST TO COAST

DISPATCH is a trucking company that desperately needed a cash infusion as a result of depressed business due to COVID as well as the recent supply chain issues.

13.    As a result, from September 12, 2022 through November 1, 2022, Plaintiff INVENTORY GENERATION INC. D/B/A COAST TO COAST DISPATCH entered into an agreement with each of the corporate defendants.

14.    Plaintiff EARL DAVID, who is the principal of INVENTORY GENERATION INC. D/B/A COAST TO COAST DISPATCH, was forced to enter into personal guarantees under each of the agreements.

15.    Defendant SILVERLINE advanced $18,800; Defendant GLOBEX advanced $13,500; Defendant WYNWOOD advanced $13,500; Defendant PROVENTURE advanced $13,500; and Defendant MCA advanced $7,500.

16.    Defendant SILVERLINE has been paid back $17,100 and claims to have a balance owed of $15,200; Defendant GLOBEX has been paid back $15,275 and claims to have a balance owed of $7,420; due to constant threat, Plaintiffs borrowed money and paid back Defendant WYNWOOD $19,000; due to constant threat, Plaintiffs borrowed money and paid back Defendant PROVENTURE $20,600; Defendant MCA has been paid back $2,132, and has issued an *ex parte*, non-judicial levy of $29,924.

17.    These are effective interest rates in the triple digits. The maximum interest rate permitted under the criminal usury laws of New York is 25%. Accordingly, Defendants have been taking interest that is many multiples above the amount allowed under the criminal laws of this State.

18.    The interest rate is even far worse due to Defendants' typical scheme of only advancing a portion of the amount promised, and then lending the merchant back its money, at a criminally usurious interest rate.

19.    For example, Defendant SILVERLINE "purchased" "$20,000 but only advanced $18,800; Defendant GLOBEX "purchased" $15,000 but only advanced $13,500; Defendant WYNWOOD "purchased" $15,000 but only advanced $13,105; Defendant PROVENTURE "purchased" $15,000 but only advanced $13,500; and Defendant MCA "purchased" $10,000 but only advanced $7,800.

20.    Plaintiffs now bring this action on behalf of Plaintiffs and those similarly situated, to permanently enjoin Defendants from their myriad unlawful practices.

## THE PARTIES

21.    Plaintiff INVENTORY GENERATION INC. D/B/A COAST TO COAST DISPATCH, is a domestic New York corporation, with its principal place of business located in Brooklyn, New York.

22.    Plaintiff EARL DAVID is an individual and citizen of New York.

23.    Defendant SILVERLINE SERVICES INC. is a domestic New York corporation with its principal place of business at 265 Sunrise Hwy, Ste 236, Rockville Centre, NY 11570.

24.    Upon information and belief, Defendant SHMUEL BRUMMEL is the CEO of Defendant SILVERLINE, with a business address at 265 Sunrise Hwy, Ste 236, Rockville Centre, NY 11570.

25.    Defendant PROVENTURE CAPITAL FUNDING LLC is a domestic limited liability company with its principal place of business at 132 32nd Street, Brooklyn, NY 11232.

26.    Upon information and belief, Defendant BENJAMIN ARYEH is the CEO of Defendant PROVENTURE, with a business address at 132 32nd Street, Brooklyn, NY 11232.

27.    Defendant WYNWOOD CAPITAL GROUP LLC is a Florida limited liability company with its principal place of business at 20200 W Dixie Highway, Miami, FL 33180.

28.     Upon information and belief, Defendant ZALMEN TEITELBAUM is a principal of Defendant WYNWOOD, with a business address at 20200 W Dixie Highway, Miami, FL 33180.

29.     Upon information and belief, Defendant SAM GROSS is a principal of Defendant WYNWOOD, with a business address at 20200 W Dixie Highway, Miami, FL 33180.

30.     Defendant GLOBEX FUNDING LLC is a New Jersey limited liability company with its principal place of business at 1274 49th St. Suite 651, Brooklyn, NY 11219.

31.     Upon information and belief, Defendant JACK BROWN is the CEO of Defendant GLOBEX, with a business address at 1274 49th St. Suite 651, Brooklyn, NY 11219.

32.     Defendant MCA RECEIVABLES, LLC D/B/A UNITED FUND USA, is a Connecticut limited liability company with its principal place of business at 99 Wall St, New York, NY 10005.

33.     Despite doing business in New York, Defendant MCA does not appear licensed to do so, as it does not appear in the New York Department of State Division of Corporations database.

34.     Upon information and belief, Defendant YISROEL C. GETTER is a principal of Defendant MCA, with a business address at 99 Wall St, New York, NY 10005.

35.     Defendants John Does 1-10 are additional principals of each of the corporate defendants whose identities are at this time unknown to Plaintiffs, but who are full participants in the fraudulent criminal enterprises discussed herein.

36.     Defendants John Doe Investors 1-10 are individuals and organizations whose identities are at this time unknown to Plaintiffs, but who knowingly fund, assist, and profit from the fraudulent criminal enterprises discussed herein, with full knowledge of the nature of the

activity in which the enterprises are engaged.

## JURISDICTION

37.     Each Defendant is subject to the personal jurisdiction of this Court because each Defendant regularly transacts business within the State of New York, has purposefully availed itself of the laws of New York for the specific transactions at issue, or has selected New York as the forum for all disputes related to the transactions.

38.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), because (i) at least one member of the Class is a citizen of a different state than Defendants, (ii) the amount in controversy exceeds $5,000,000 exclusive of interest and costs, and (iii) none of the exceptions under that subsection apply to this action.

39.     This Court additionally has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiffs' claims for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S.C. §§ 1961–68 ("RICO").

40.     The Court has subject-matter jurisdiction over Plaintiffs' state-law claims because they are so related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

41.     This Court also has jurisdiction under 28 U.S.C. § 2201 *et. seq.*

42.     Venue is proper because each Defendant regularly conducts business within this judicial district.

## COMMON FACTUAL ALLEGATIONS

### A.      The Predatory MCA Industry.

43.     The MCA Industry spawned from the 2008 Financial Crisis. One of the earliest MCA companies, Yellowstone Capital LLC, was co-founded in 2009 by David Glass, an

inspirational character for the movie "Boiler Room."[2] As Mr. Glass confessed to Bloomberg News, "it's a lot easier to persuade someone to take money than to spend it buying stock." Just like in the movie, MCA companies utilize high-pressure boiler room tactics, employing salespersons with absolutely no financial background whatsoever.

44.    As Bloomberg previously reported, the MCA Industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[3] The MCA Industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy." *Id.* As one of these brokers admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage.  There's no license you need to file for. It's pretty much unregulated." *Id.*

  **B.**  **The Sham.**

45.    Many states, like New York, have laws prohibiting the predatory interest rates. In order to evade these criminal usury laws, MCA companies disguise their agreements as "purchases of future receivables." MCA companies promote a fiction that, rather than making loans to merchants, they are purchasing, at a discount, a fixed amount of the merchant's future receivables, usually to be repaid through a fixed daily or weekly payment that purportedly represents a percentage of the merchant's receipts. The form of the contract thus allows MCAs to represent to courts that they, not the merchants, assume the risk that the merchants will fail to generate receivables. But the picture they paint is contrary to reality. By operation of their agreements' default rights and remedies, the MCA companies exert complete control over the

---

[2] https://www.sec.gov/litigation/admin/2008/34-58574.pdf
[3] https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans

relationship and compel their merchants to make the fixed payments or suffer the consequences.

### C.   The Bloomberg Awakening.

46.   For nearly a decade, MCAs operated under the radar of regulators, compiling over 25,000 confessions of judgment against small businesses and their individual owners. That all changed on November 20, 2018 when Bloomberg News and renowned journalist Bethany McLean published what would be the first in a series of groundbreaking news articles exposing the abuses of the predatory MCA industry.[4]

47.   As a direct result of the light shined on these abuses, the New York Legislature quickly enacted legislation extinguishing their weapon of mass destruction, the confession of judgment, expressly citing the Bloomberg articles as its inspiration.

48.   Congress also took notice. On June 26, 2019, the United States House of Representatives held a hearing titled: "Crushed by Confessions of Judgment: the Small Business Story." As explained by Professor Hosea Harvey, a contracts expert from Temple University, small businesses are just as susceptible to predatory lending as unsophisticated individuals.[5]

49.   Regulators have also taken action. On July 31, 2020, the New York Attorney General brought suit against a group of MCA companies, as well as their principals, alleging that their MCA agreements constitute criminally usurious loans.[6]

50.   On July 31, 2020, the Securities and Exchange Commission shut down an MCA company. In its complaint, the SEC alleged that Par Funding "made opportunistic loans, some of which charged more than 400% interest, to small businesses across America."[7] The FBI

---

[4] https://www.yahoo.com/entertainment/merchant-cash-advances-salvation-small-businesses-payday-lending-reincarnate-161835117.html

[5] https://www.congress.gov/event/116th-congress/house-event/LC64251/text?s=1&r=60

[6] https://ag.ny.gov/press-release/2020/attorney-general-james-sues-predatory-lender-threatened-violence-and-kidnapping

[7] https://www.sec.gov/litigation/litreleases/2020/lr24860.htm

thereafter raided its offices, confiscating a cache of guns, millions of dollars in cash, and a private airplane.[8]

51.     On June 10, 2020, the Federal Trade Commission filed a complaint against John Braun and his various companies alleging various fraudulent and deceptive practices in connection with MCAs.  *See* Ex. 6.[9]

52.     On August 3, 2020, the Federal Trade Commission filed a complaint against Yellowstone.[10] Notably, the FTC complained that Yellowstone "unlawfully withdrew millions of dollars in excess payments from their customers' accounts, and to the extent they provided refunds, sometimes took weeks or even months to provide them." *Id.*

53.     On November 10, 2020, the California Commission of Financial Protection and Innovation entered into a Consent Order with Allup Financial LLC, finding that its MCA agreements were lending transactions subject to the California Finance Lenders Law, and barring the MCA company from doing business in California unless and until it complies with its laws.[11]

54.     On December 8, 2020, the New Jersey Attorney General also filed suit against Yellowstone, alleging it cheated "financially-strapped small businesses and their owners out of millions of dollars nationwide by luring them into predatory loans disguised as cash advances on future receivables with interest rates far exceeding the interest rate caps in the State's usury laws."[12]

55.     On December 23, 2020, New York signed into law the Small Business Truth in

---

[8] https://www.inquirer.com/news/par-funding-better-financial-plan-joseph-laforte-dean-vagnozzi-20200731.html
[9] https://www.ftc.gov/system/files/documents/cases/192_3252_rcg_advances_-_complaint.pdf
[10] https://www.ftc.gov/news-events/press-releases/2020/08/ftc-alleges-merchant-cash-advance-provider-overcharged-small
[11] https://dfpi.ca.gov/wp-content/uploads/sites/337/2020/11/Consent-Order-Allup-Finance-LLC.pdf
[12] https://www.njoag.gov/ag-grewal-files-suit-against-yellowstone-capital-llc-and-associated-companies-alleging-the-merchant-cash-advance-companies-targeted-small-businesses-with-predatory-lending-and-abusive-collection-pract/

Lending Law, which is aimed at "protecting small business owners," and "requires key financial terms such as the amount financed, fees and annual percentage rate (APR) to be disclosed at the time a credit provider or broker makes an offer of financing of $500,000 or less."[13]

56.     As Gretchen Morgensen of NBC News recently reported, however, the financial greed of predatory lenders, like Defendants, has only accelerated in the wake of Covid-19.[14]

**D.     The Sea Change in Law.**

57.     Prior to the Bloomberg Awakening, courts routinely rejected attempts by small business victims seeking to vacate the many thousands of confessions of judgments filed by MCA companies. Courts primarily denied those attempts on the procedural basis that a plenary action must be filed instead of merely seeking to vacate by motion. One court went so far as to sanction the attorney for even bringing the motion. *See, e.g., Yellowstone Capital LLC v. Central USA Wireless LLC*, 2018 N.Y. Misc. LEXIS 2516, *2 (N.Y. Sup. Ct., Erie Cty Jun. 25, 2018) (citing *Yellowstone Capital, LLC v. Jevin*, Index No. 802457/2017 (N.Y. Sup. Ct. Erie Co. Oct. 6, 2017)).

58.     The tide has since turned in the wake of the Bloomberg articles. Most notable is the decision by Judge Nowak, a Commercial Division Justice out of Erie County—a favorite forum for MCAs given Upstate New York's more conservative political leanings. *See McNider Mar., LLC v Yellowstone Capital, LLC*, 2019 N.Y. Misc. LEXIS 6165 (N.Y. Sup. Ct., Erie Cty Nov. 19, 2019). Notably, Judge Nowak reversed his own prior decision in *Yellowstone Capital, LLC v. Jevin*, *supra*, where he previously held that the very same Yellowstone agreement was not a loan as a matter of law. This time, upon further reflection, Judge Nowak not only upheld

---

[13] https://www.jdsupra.com/legalnews/gov-cuomo-signs-new-york-small-business-9450503/
[14] https://www.nbcnews.com/business/economy/feds-crack-down-lenders-targeting-small-businesses-high-interest-loans-n1236167

the claims of usury, but also upheld the RICO claims. Numerous courts have followed suit. *See, e.g., Davis v. Richmond Capital Group*, 194 A.D.3d 516 (1ˢᵗ Dept. 2021); *NRO Boston LLC v. Yellowstone Capital LLC*, 2021 N.Y. Misc. LEXIS 1892 (Rockland Cty, April 9, 2021) (upholding RICO claims); *LG Funding LLC v. United Senior Properties of Olathe LLC,* 122 N.Y.S.3d 309 (2d Dep't. 2020); *American Resources Corp. v. C6 Capital, LLC*, 2020 N.Y. Misc. LEXIS 10725, *6 (N.Y. Sup. Ct., Kings Cty. Dec. 16, 2020); *Funding Metrics LLC v. NRO Boston*, 2019 N.Y. Misc. LEXIS 4878 (N.Y. Sup. Westch. Cty. Aug. 28, 2019); *Funding Metrics, LLC v. D & V Hospitality*, 62 Misc.3d 966 (N.Y. Sup. Westch. Cty. Jan. 7, 2019), *rev'd on other grounds*.

59.     Numerous federal courts, including this Court, have also joined the revolution. *See Lateral Recovery LLC v. Queen Funding LLC*, Case No. 21-civ-9607 22, 2022 U.S. Dist. 129032 (S.D.N.Y. July 20, 2022) (upholding RICO claims under MCA agreement); *Fleetwood Servs. LLC v. Ram Capital Funding, LLC*, Case No. 20-cv-5120 (LJL), 2022 U.S. Dist. LEXIS 100837 at *32 (S.D.N.Y. June 6, 2022) (applying risk-transfer analysis to an MCA agreement to conclude agreement was a criminally usurious loan in granting summary judgment on merchant's unlawful debt RICO collection claims); *Haymount Urgent Care PC v. GoFund Advance, LLC*, 22-cv-1245 (JSR), 2022 WL 2297768, *16 (S.D.N.Y. June 27, 2022) (same); *Fleetwood Servs., LLC v. Complete Bus. Sols. Grp.*, 374 F.Supp.3d 361 (E.D. Pa. 2019) (same); *NRO Boston v. Funding Metrics*, 2018 U.S. Dist. LEXIS 239152 (E.D. Pa. May 23, 2018) (same); *Davis v. Richmond Capital Group*, 194 A.D.3d 516 (1st Dept. 2021); *NRO Boston LLC v. Yellowstone Capital LLC*, 2021 N.Y. Misc. LEXIS 1892 (Rockland Cty, April 9, 2021) (upholding RICO claims).

60.     So has New York's highest court. Most notably, a member of New York's highest court, just recently advised in *dicta* that MCA transactions, like here, more closely resemble

loans subject to New York's usury laws rather than bona fide sales of receivables:

> Although the GTR and CMS agreements are described as 'factoring' agreements, they do not bear several of the hallmarks of traditional factoring arrangements, in that FutureNet did not sell any identifiable receivable to GTR or CMS; GTR and CMS did not collect any receivables; GTR and CMS received fixed daily withdrawals from FutureNet's bank account regardless of whether or how much FutureNet collected from or billed to its clients; and GTR and CMS did not bear the risk of nonpayment by any specific customer of FutureNet. The arrangements FutureNet entered with GTR and CMS appear less like factoring agreements and more like high- interest loans that might trigger usury concerns (*see Adar Bays, LLC v GeneSYS ID*, NE3d, 2021 NY Slip Op 05616 [2021]). Nevertheless, for the purpose of these certified questions, we are asked to assume the judgments rendered on those agreements are valid.

*Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 2021 N.Y. LEXIS 2577, *45, 2021 NY Slip Op 07055, 11, 2021 WL 5926893 (N.Y. Dec. 16, 2021).

### E.     The MCA Agreements are Substantively and Procedurally Unconscionable.

61.     The MCA Agreements are unconscionable contracts of adhesion that are not negotiated at arms-length.

62.     Instead, the MCA Agreements contain one-sided terms that prey upon the desperation of the small business and their individual owners and help conceal the fact that each of the transactions, including those involving the Plaintiffs, are really loans.

63.     Among these one-sided terms, the MCA Agreements include: (1) a provision giving the MCA company the irrevocable right to withdraw money directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing the merchant from transferring, (3) moving or selling the business or any assets without permission from the MCA company, (4) a one-sided attorneys' fees provision obligating the merchant to pay the MCA company's attorneys' fees but not the other way around, (5) a venue and choice-of-law provision requiring the merchant to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction, (6) a personal guarantee, the revocation of

which is an event of default, (7) a jury trial waiver, (8) a class action waiver, (9) a collateral and

security agreement providing a UCC lien over all of the merchant's assets, (10) a prohibition of

obtaining financing from other sources, (11) the maintenance of business interruption insurance,

(12) an assignment of lease of merchant's premises in favor of the MCA company, (13) the right

to direct all credit card processing payments to the MCA company, (14) a power-of-attorney to

settle all obligations due to the MCA Company and (15) a power of attorney authorizing the

MCA company to "file any claims or taken any action or institute any proceeding…"

64.     The MCA Agreements are also unconscionable because they contain numerous

knowingly false statements. Among these knowingly false statements are that: (1) the transaction

is not a loan, (2) the daily payment is a good-faith estimate of the merchant's receivables, (3) the

fixed daily payment is for the merchant's convenience, (4) that the automated ACH program is

labor intensive and is not an automated process, requiring the MCA company to charge an

exorbitant ACH Program Fee or Origination Fee.

65.     The MCA Agreements are also unconscionable because they are designed to fail.

Among other things, the MCA Agreements are designed to result in a default in the event that the

merchant's business suffers any downturn in sales by preventing the merchant from obtaining

other financing and requiring the merchant to continuously represent and warrant that there has

been no material adverse changes, financial or otherwise, in such condition, operation or

ownership of Merchant.

66.     The MCA Agreements also contain numerous improper penalties that violate New

York's strong public policy. Among these improper penalties, the MCA Agreements (1) entitle

the MCA company to attorneys' fees, (2) accelerate the entire debt upon an Event of Default, and

(3) require the merchant to turn over 100% of all of its receivables if it misses just one fixed

daily payment.

67.     The Daily Payments under each of the MCA Agreements described below were fixed and absolute and each of the agreements' reconciliation provisions were a sham.

68.     Defendants did not maintain reconciliation departments and did not have any one trained or otherwise dedicated to performing any reconciliation of a merchant's accounts. Indeed, the MCA Agreements did not contain any functioning contact information whereby Plaintiffs could even request a reconciliation within the terms of that provision.

69.     The terms of the reconciliation provisions further reveal the sham.

**F.     The Enterprise Intentionally Disguises the True Nature of the Transactions.**

70.     Despite the documented form, the transactions are, in economic reality, loans that are absolutely repayable. Among other hallmarks of a loan:

(a)     The Daily Payments are fixed and the so-called reconciliation provision are mere subterfuge to avoid this state's usury laws. Rather, just like any other loan, the Purchased Amount is to be repaid within a specified time;

(b)     The default and remedy provisions purport to hold the merchants absolutely liable for repayment of the Purchased Amount. The loans seek to obligate the merchants to ensure sufficient funds are maintained in the Account to make the Daily/Weekly Payments and, after a certain number of instances of insufficient funds being maintained in the Account, the merchants are in default and, upon default, the outstanding balance of the Purchased Amount becomes immediately due and owing;

(c)     While the agreements purport to "assign" all of the merchant's future account receivables to the Enterprise until the Purchased Amount is paid, the merchants retain all the indicia and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof. Indeed, rather than purchasing receivables, the Enterprise merely acquires a security interest in the merchant's accounts to secure payment of the Purchased Amount;

(d)     The transactions are underwritten based upon an assessment of the merchant's credit worthiness; not the creditworthiness of any account debtor;

(e)     The Purchased Amount is not calculated based upon the fair market value of the merchant's future receivables, but rather is unilaterally dictated by the Enterprise based upon the interest rate it wants to be paid. Indeed, as part of the

underwriting process, the Enterprise does not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value;

(f)      The amount of the Daily Payments is determined based upon when the Enterprise wants to be paid, and not based upon any good-faith estimate of the merchant's future account receivables;

(g)      The Enterprise assumes no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constitutes a default under the agreements;

(h)      The Enterprise requires that the merchants undertake certain affirmative obligations and make certain representations and warranties that are aimed at ensuring the company will continue to operate and generate receivables and a breach of such obligations, representations and warranties constitutes a default, which fully protects the Enterprise from any risk of loss resulting from the merchant's failure to generate and collect receivables.

(i)      The Enterprise requires that the merchant grant it a security interest in its receivables and other intangibles and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which the Enterprise knew would be breached from day one.

## FACTS SPECIFIC TO PLAINTIFFS

### A.      Inventory Generation Inc.

71.      Inventory is a common carrier engaged in transportation by motor vehicle in interstate or foreign commerce.

72.      In layman's terms, Inventory is engaged in motor carrier services for freight brokers and shippers, and Inventory has been providing and continues to provide essential services during the Covid-19 pandemic throughout the continental United States.

73.      As part of its business, Inventory at times pays independent truckers to make deliveries on its behalf all over the United States.

74.      As a direct result of the COVID-19 pandemic coupled by the supply chain issues that have plagued the United States, Inventory's funds were greatly reduced and Inventory was unable to meet its expenses.

75.     Inventory's margins were always small, and the pandemic and supply chain issues only exacerbated that situation.

76.     Trucking, however, is an essential business, and Inventory needed to find a way to continue to pay its drivers.

77.     Enter the MCAs.

78.     As immediately discussed herein, due to the unlawful and unconscionable interest rates charged by the MCA companies, Inventory was trapped in a never-ending spiral of debt, effectively being forced to enter into a series of MCA loans to pay off each of the prior ones.

**B.     The First Usurious Loan (Silverline)**

79.     Plaintiffs entered into their First MCA Agreement with Silverline on September 12, 2022 ("First MCA").

80.     The First MCA provided Plaintiffs an advance of $20,000.00 ("Purchase Price") in exchange for the purported purchase of all of Plaintiff's future receipts (the "Future Receipts") until such time as the amount of $29,580.00 (the "Purchased Amount") was repaid.

81.     The Purchased Amount was to be repaid through daily ACH withdrawal in the amount of $328.67 (a "Daily Payment"), and the amount would be repaid in just 90 days which, on its face, translates to an annual interest rate of more than 191% per annum or more than 7 times the maximum 25% rate permitted under New York Penal Law.

82.     The fixed daily payment was disguised as a good-faith estimate equal to 10% of Inventory's daily revenues. The estimated daily payment did not remotely reflect 10% of Inventory's daily revenues. Rather, the estimated daily amount was dictated by Silverline based on the length of the payment term of the loan.

83.     Silverline entered into the sham First MCA agreement with Plaintiffs wherein the

Plaintiffs were forced to pay an unconscionable interest rate of more than 191%. Plaintiffs were forced to make daily payments that accounted for this unconscionable interest rate.

84.     Even worse, Silverline did not advance Plaintiff the full Purchased Amount. Instead, Merchant Capital deducted an "Origination Fee" of 3% of the purchase price for origination and related expenses.

85.     Silverline also deducted an "Underwriting Fee" of 3% of the purchase price for underwriting and related expenses.

86.     While the Origination Fee and Underwriting Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, Silverline performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee. Indeed, in reality, the Origination Fee , Underwriting Fee, and other fees were merely additional disguised interest.

87.     As a direct result of these sham fees, Inventory received a total of $18,800, despite having a face amount of $20,000.

88.     Given the inability to sustain the unconscionable payments to Silverline, Plaintiffs were forced to enter into another MCA in order to pay this First MCA.

**C.     Globex: The Second Usurious loan.**

89.     Plaintiffs entered into their second MCA Agreement with Defendant Globex on September 30, 2022 ("Second MCA").

90.      The Second MCA provided Plaintiffs an advance of $15,000.00 ("Purchase Price") in exchange for the purported purchase of all of Plaintiff's future receipts (the "Future Receipts") until such time as the amount of $22,485.00 (the "Purchased Amount") was repaid.

91.      The Purchased Amount was to be repaid through daily ACH withdrawal in the

amount of $375 (a "Daily Payment"), and the amount would be repaid in just 60 days which, on its face, translates to an annual interest rate of more than 299% per annum or 12 times the maximum 25% rate permitted under New York Penal Law.

92.     The fixed daily payment was disguised as a good-faith estimate equal to 20% of Inventory's daily revenues. The estimated daily payment did not remotely reflect 20% of Inventory's daily revenues. Rather, the estimated daily amount was dictated by Globex based on the length of the payment term of the loan.

93.     Globex entered into the sham Second MCA agreement with Plaintiffs wherein the Plaintiffs were forced to pay an unconscionable interest rate of 299%. Plaintiffs were forced to make daily payments that accounted for this unconscionable interest rate.

94.     Even worse, Globex did not advance Plaintiff the full Purchased Amount.

95.     Instead, Globex deducted an "Origination Fee" of 6% of the purchase price to cover cost of origination and ACH Setup.

96.     Globex also deducted an Underwriting Fee of 6% of the purchase price for underwriting and related expenses.

97.     While the Origination Fee and Underwriting Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, Globex performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee. Indeed, in reality, the Origination Fee , Underwriting Fee, and other fees were merely additional disguised interest.

98.     As a direct result of these sham fees, Inventory received a total of $13,500, despite having a face amount of $15,000.

99.     Given the inability to sustain the unconscionable payments to Globex, Plaintiffs

were forced to enter into another MCA in order to pay the Second MCA.

      **D.**      **Proventure: The Third Usurious loan.**

100.    On October 25, 2022, Plaintiffs entered into a Third MCA with Defendant Proventure ("Third MCA").

101.    The Third MCA provided Plaintiffs an advance of $15,000.00 ("Purchase Price") in exchange for the purported purchase of all of Plaintiff's future receipts (the "Future Receipts") until such time as the amount of $22,485.00 (the "Purchased Amount") was repaid.

102.    The Purchased Amount was to be repaid through daily ACH withdrawal in the amount of $562.12 (a "Daily Payment"), and the amount would be repaid in just 40 days which, on its face, translates to an annual interest rate of more than 450% per annum or 18 times the maximum 25% rate permitted under New York Penal Law.

103.    The fixed daily payment was disguised as a good-faith estimate equal to 25% of Inventory's daily revenues. The estimated daily payment did not remotely reflect 25% of Inventory's daily revenues. Rather, the estimated daily amount was dictated by Defendant Proventure based on the length of the payment term of the loan.

104.    Proventure entered into the sham Third MCA agreement with Plaintiffs wherein the Plaintiffs were forced to pay an unconscionable interest rate of 450%. Plaintiffs were forced to make daily payments that accounted for this unconscionable interest rate.

105.    Even worse, Proventure did not advance Plaintiff the full Purchased Amount. Instead, Proventure deducted an "Origination Fee" of 10% of the purchase price to cover cost of origination and ACH Setup.

106.    While the Origination Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, Proventure performed little or no due diligence and the actual

costs of the ACH withdrawals were a fraction of the fee. Indeed, in reality, the fees were merely additional disguised interest.

107.    As a direct result of these sham fees, Inventory received a total of $13,500, despite having a face amount of $15,000.

108.    Moreover, Proventure's broker promised Plaintiffs an additional $50,000 in funding and lower interest rates after 10 payments.

109.    This was a categorical falsehood, as Plaintiffs never received any additional funding or lower interest payment.

110.    Given the inability to sustain the unconscionable interest rate of the Third MCA, the Plaintiffs were in dire need of additional funding.

### E.    MCA Receivables: The Fourth Usurious Loan.

111.    On October 26, 2022, Plaintiffs entered into the Fourth MCA with Defendant MCA Receivables ("Fourth MCA").

112.    The Fourth MCA provided Plaintiffs an advance of $10,000.00 ("Purchase Price") in exchange for the purported purchase of all of Plaintiff's future receipts (the "Future Receipts") until such time as the amount of $15,990.00 (the "Purchased Amount") was repaid.

113.    The Purchased Amount was to be repaid through daily ACH withdrawal in the amount of $533 (a "Daily Payment"), and the amount would be repaid in just 30 days which, on its face, translates to an annual interest rate of more than 718% per annum or more than 28 times the maximum 25% rate permitted under New York Penal Law.

114.    The fixed daily payment was disguised as a good-faith estimate equal to 45% of Inventory's daily revenues. The estimated daily payment did not remotely reflect 45% of Inventory's daily revenues. Rather, the estimated daily amount was dictated by Defendant MCA

Receivables based on the length of the payment term of the loan.

115.     MCA Receivables entered into the sham Fourth MCA agreement with the Plaintiffs wherein the Plaintiffs were forced to pay an unconscionable interest rate of more than 718%. Plaintiffs were forced to make daily payments that accounted for this unconscionable interest rate.

116.     MCA Receivables did not advance Plaintiff the full Purchased Amount. Instead, MCA deducted an "Origination Fee" 10% of the purchase price to cover cost of Original and ACH Setup.

117.     MCA Receivables also deducted an Underwriting Fee of 10% of the purchase price for underwriting and related expenses.

118.     While the Origination Fee and Underwriting Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, MCA Receivables performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee. Indeed, in reality, the Origination Fee, Underwriting Fee, and other fees were merely additional disguised interest.

119.     As a direct result of these sham fees, Inventory received a total of $7,800, despite having a face amount of $10,000.

120.     Given the inability to sustain the unconscionable interest rate of the Fourth MCA, the Plaintiffs were in dire need of additional funding.

     **F.     Wynwood: The Fifth Usurious Loan.**

121.     On November 1, 2022, Plaintiffs entered into a Fifth MCA with Defendant Wynwood ("Fifth MCA").

122.     The Fifth MCA provided Plaintiffs an advance of $15,000.00 ("Purchase Price")

in exchange for the purported purchase of all of Plaintiff's future receipts (the "Future Receipts") until such time as the amount of $22,485.00 (the "Purchased Amount") was repaid.

123.    The Purchased Amount was to be repaid through daily ACH withdrawal in the amount of $562.13 (a "Daily Payment"), and the amount would be repaid in just 40 days which, on its face, translates to an annual interest rate of 450% per annum or 18 times the maximum 25% rate permitted under New York Penal Law. Plaintiffs were forced to make daily payments that accounted for this unconscionable interest rate.

124.    Once again, the fixed daily payment was disguised as a good-faith estimate equal to 20% of Inventory's daily revenues. The estimated daily payment did not remotely reflect 20% of Inventory's daily revenues. Rather, the estimated daily amount was dictated by Defendant Wynwood based on the length of the payment term of the loan.

125.    Wynwood did not advance Plaintiff the full Purchased Amount. Instead, Wynwood deducted an "Origination Fee" of 10% of the purchase price to cover cost of origination and ACH Setup.

126.    Wynwood also deducted an Underwriting Fee of 10% of the purchase price for underwriting and related expenses.

127.    While the Origination Fee and Underwriting Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, Wynwood performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee. Indeed, in reality, the Origination Fee, Underwriting Fee, and other fees were merely additional disguised interest.

128.    As a direct result of these sham fees, Inventory received a total of $13,105, despite having a face amount of $15,000.

G.    **Plaintiffs run out of money and Defendants Engage in Abusive Threats and Tactics.**

129.    Faced with crippling daily payments far in excess of anything that Plaintiffs could afford, on or about November 12, 2022, Plaintiffs stopped ACH payments on Inventory's bank account.

130.    Soon thereafter, a number of the Defendants began threatening Plaintiffs, one even implying physical harm.

131.    For example, on or about December 6, Defendant Benjamin Aryeh texted Earl that he was a "motherfucker" and that Aryeh was going to "come after [him] personally" and that Earl had "no idea what [Aryeh] was going to do."

132.    Defendants have been harassing Plaintiffs, texting, threatening, and/or calling him on a daily basis.

133.    On December 9, 2022, Earl suddenly found that Inventory had no money in its bank account.

134.    Earl reached out to his bank, and was informed that Defendant MCA Receivables (who had made a loan of only $7,500) had issued a levy on his account for $29,924.

135.    Additionally, Earl's personal bank account was hit with withdrawals.

136.    Earl received no notice whatsoever before the levy was imposed on his account.

137.    Apparently, MCA Receivables utilized the Connecticut loophole exposed by Bloomberg News, and levied all of Inventory's assets in New York (despite the fact that the Connecticut loophole only applies to assets in Connecticut) with nothing more than the signature of MCA's attorney.

138.    Plaintiffs' accounts have since been unfrozen, although the levied amounts have been withdrawn by TD and Plaintiffs are without funds to operate their business.

139.     Moreover, the account remains subject to another attack by MCA Receivables and their attorneys, who continue to threaten Plaintiffs on a daily basis that they will hit him with another $11,000 in fees if he does not sign a release that he has no claims against them.

140.     Scared of the harassment and threats he was receiving, Earl used a line of credit to borrow more money to pay off Defendants Wynwood and Proventure, and now he owes ~$30,000 on this credit line.

    **H.     Fraudulent Scheme**.

141.     The Defendants have unlawfully provided usurious loans by way of the MCA Agreements.

142.     Defendants have engaged in predatory and fraudulent conduct that allowed them to fraudulently extract even more monies from Plaintiff.

143.     Among other things, Defendants charged Plaintiff thousands of dollars in so-called "Origination Fee s" and "Underwriting Fees" to cover the costs of due diligence that they never performed and "ACH fees" to cover ACH operations they claimed were "labor intensive" but, in actuality, were fully automated and cost a mere fraction of the fees charged to Plaintiff.


## CLASS ALLEGATIONS

144.     Plaintiffs and the putative Classes repeat and re-allege the allegations of each of the foregoing paragraphs as if fully alleged herein.

145.     Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(2) and 23(b)(3).

146.     Plaintiffs bring this action individually and on behalf of classes of similarly situated persons defined as follows:

> All persons in the United States who, on or after December 13, 2018, paid money to a member of the Enterprise pursuant to an MCA Agreement with an effective interest rate exceeding twenty-five percent.

147.    Plaintiffs also bring this action individually and on behalf of classes of similarly situated persons defined as follows:

> All persons in the United States who, on or after December 13, 2018, had their bank account frozen as a result of a writ of attachment issued by Defendants under the color of Connecticut law.

The following people are excluded from the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released or waived; (5) Plaintiffs' and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

148.    **Numerosity**:  The exact number of members of the Classes is unknown and is not available to Plaintiffs at this time, but individual joinder in this case is impracticable. Based on publicly available documents, each of the Classes likely numbers in the hundreds.

149.    **Commonality and Predominance**:  There are many questions of law and fact common to the claims of Plaintiffs and the other Class members, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class but are not limited to the following:

a)    Whether the MCA Agreements are loans;

b)    Whether the MCA Agreements are usurious;

c)    Whether the MCA Agreements are void;

d)    Whether Plaintiffs and the Classes may recover any moneys or property

paid to the Enterprise pursuant to the MCA agreements;

      e)      Whether Defendants violated the Due Process Clause by issuing writs of attachment on third-party banks without filing a complaint or serving Defendants;

      f)      Whether Defendants' conduct was willful or knowing.

150.    **Typicality**: Plaintiffs' claims are typical of the claims of the other members of the Classes. Plaintiffs and members of the Classes sustained damages as a result of Defendants' uniform wrongful conduct during transactions with Plaintiffs and the Classes.

151.    **Adequate Representation**: Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Classes, and have retained counsel competent and experienced in complex litigation. Plaintiffs have no interests antagonistic to those of the Classes, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and they have the resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Classes

152.    **Superiority**: This case is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The injuries suffered by the individual members of the Classes are likely to have been relatively small compared to the burden and expense of individual prosecution of the litigation necessitated by Defendants' actions. Absent a class action, it would be difficult, if not impossible, for the individual members of the Classes to obtain effective relief from Defendants. Even if members of the Classes themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense

to all parties and the Court and require duplicative consideration of the legal and factual issues

presented herein. By contrast, a class action presents far fewer management difficulties and

provides the benefits of single adjudication, economy of scale, and comprehensive supervision

by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of

decisions will be ensured.

## FIRST CAUSE OF ACTION
### (RICO: 18 U.S.C. § 1962)

153.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

**A.      The Unlawful Activity.**

154.    More than a dozen states, including New York, place limits on the amount of

interest that can be charged in connection with providing a loan.

155.    In 1965, the Legislature of New York commissioned an investigation into the

illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

156.    As recognized by the New York Court of Appeals in *Hammelburger v. Foursome

Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on

Investigation entitled An Investigation of the Loan-Shark Racket brought to the attention of the

Governor and the public the need for change in both, as well as for change in the immunity

statute, and for provisions making criminal the possession of loan-shark records and increasing

the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce

payment."

157.    As a result of this Report, a bill was proposed to allow corporations to interpose

the defense of usury in actions to collect principal or interest on loans given at interest greater

than twenty-five percent per annum.

158.    This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

159.    As noted above, loan-sharks with full knowledge of the prior law, made it a policy to loan to corporations.

160.    The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

161.    Like here, this was a purely artificial device used by the loanshark to evade the law—an evasion that the Legislature sought to prevent.

162.    Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

### B.    Culpable Persons.

163.    Brummel, Aryeh, Teitelbaum, Gross, Brown, and Getter are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is an individual capable of holding a legal interest in property. Upon information and belief, they are respectively the owners of Silverline, Proventure, Wynwood, Globex, and MCA Receivables, with each having less than ten (10) employees.

### C.    The Enterprises.

164.    Defendants Brummel, John Does 1-10, Silverline, and their Defendant John Doe Investors 1-10 constitute an Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

165.    Defendants Aryeh, John Does 1-10, Proventure, and their Defendant John Doe Investors 1-10 constitute an Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

166.    Defendants Teitelbaum, Gross, John Does 1-10, Wynwood, and their Defendant John Doe Investors 1-10 constitute an Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

167.    Defendants Brown, John Does 1-10, Globex, and their Defendant John Doe Investors 1-10 constitute an Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

168.    Defendants Getter, John Does 1-10, MCA Receivables, and their Defendant John Doe Investors 1-10 constitute an Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

169.    Each Enterprise is associated in fact through relations of ownerships for the common purpose of carrying on an ongoing unlawful enterprise. Specifically, each Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

170.    Since at least 2015 and continuing through the present, the members of the Silverline Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

171.    Since at least 2021 and continuing through the present, the members of the Proventure Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

172.     Since at least 2021 and continuing through the present, the members of the Wynwood Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States

173.     Since at least 2022 and continuing through the present, the members of the Globex Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

174.     Since at least 2022 and continuing through the present, the members of the MCA Receivables Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

175.     Upon information and belief, many of these individuals have operated, or are operating, other MCA enterprises under alternative names.

176.     The debt, including such debt evidenced by the agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under New York Penal Law §190.40.

177.     The members of each Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements

relating to and for the purpose of collecting upon fraudulent fees through electronic wires.

178.    The Enterprise's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1). Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

   **D.    The Roles of the RICO Persons in Operating the Enterprise, and the roles of the individual companies within the Enterprise.**

179.    The RICO Persons have organized themselves and each Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

180.    Upon information and belief, Brummel, Aryeh, Teitelbaum, Gross, Brown, and Getter are principals of each respective Enterprise ("the Principals"). Together they are responsible for the day-to-day operations of each Enterprise and have final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

181.    In their capacity as principals, the Principals are responsible for creating, approving and implementing the policies, practices and instrumentalities used by each Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by each Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.

All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to Plaintiffs.

182.    The Principals have taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of each Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

183.    The Principals have ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to the other Enterprise members.

184.    The Principals have operated each Enterprise MCA company together with related Enterprise companies as part of an unlawful enterprise to collect upon unlawful debt and commit wire fraud. Pursuant to its membership in the Enterprise, each Enterprise MCA company has: (i) entered into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with Investors to fund the usurious loans; (ii) pooled the funds of Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entered into the so-called merchant agreements on behalf of the Enterprise; (v) serviced the usurious loans; (vi) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtained judgments in its name to further collect upon the unlawful debt.

185.    The Investors are a group of organizations and individual investors who maintain separate officers, books, records, and bank accounts independent of the other Enterprise Members.

186.    Directly and through their members, agent officers, and/or employees, the

Investors have been and continue to be responsible for providing the Enterprise MCA companies with all or a portion of the pooled funds necessary to fund the usurious loans, including the Agreements, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things, approving early payoff terms, settlement agreements and other financial arrangements with borrowers to collect upon the unlawful debt.

187. The Investors ultimately benefit from the respective Enterprises' unlawful activity when the proceeds of collecting upon the unlawful debts are funneled to the Investors according to their level of participation in the usurious loans.

188. In this case, each Enterprise MCA company, through the respective Defendants: (i) solicited borrowers; (ii) pooled funds from Investors to fund the agreements; (iii) underwrote the agreements; (iv) entered into the agreements; and (v) collected upon the unlawful debt evidenced by the agreements by effecting wire transfers from the bank accounts of Plaintiffs.

### E. Interstate Commerce

189. Each Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

190. Specifically, members of each Enterprise maintain offices in New York and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in New York, and throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

191. In the present case, all communications between the members of each Enterprise were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, each Enterprise used interstate emails to originate, underwrite,

service and collect upon the agreements, fund the advances under each of the agreements and collect the payments via interstate electronic ACH debits.

192.     In addition, at the direction of the respective Defendants, agreements were executed in states outside of New York, and original copies of the Agreements were sent to each Enterprise, through Defendants, at their offices in New York via electronic mail.

**F.     Injury and Causation.**

193.     Plaintiffs have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.

194.     The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, thousands of dollars in improperly collected criminally usurious loan payments. Plaintiffs were forced to make daily payments pursuant to the MCA Agreements that amounted to unconscionable interest rates.

195.     Under controlling New York law, the MCA Agreements are void *ab initio*. *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 2021 WL 4777289 (N.Y. Oct. 14, 2021).

196.     Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

197.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

**SECOND CAUSE OF ACTION**
**(Conspiracy under 18 U.S.C. § 1962(d))**

198.     Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

199.     Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed with members of each Enterprise to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

200.     By and through each of the Enterprise Member's business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendant and the Enterprise Members concerning the underwriting, funding, servicing and collection of the unlawful loans, including the Agreements, the respective Defendants knew the nature of the Enterprise and Defendants knew that the Enterprise extended beyond each Enterprise Member's individual role. Moreover, through the same connections and coordination, Defendant knew that the other Enterprise Members were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

201.     The respective Defendants each agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Agreements, in violation of 18 U.S.C. § 1962(c).  In particular, each Defendant was a knowing, willing, and active participant in each Enterprise and its affairs, and each of the Enterprise Members shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the agreements.

202.     The respective Defendants agreed to facilitate, conduct, and participate in the conduct, management, or operation of each Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

203.     The participation and agreement of the respective Defendants and each Enterprise Member was necessary to allow the commission of this scheme.

204.     Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at the hearing.

205.     The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, improperly collected loan payments, lost customers, loss of goodwill, and lost profits. Plaintiffs were forced to make daily payments pursuant to the MCA agreements that amounted to unconscionable interest rates.

206.     Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

207.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.


### THIRD CAUSE OF ACTION
**(Declaratory Relief)**

208.     Plaintiffs repeat and hereby incorporate each of the above allegation.

209.     A declaratory judgment is required by this Court to determine the rights and obligations of the parties with respect to the MCA Agreements are void as a matter of law.

210.     A declaratory judgment declaring that the respective Defendants have no right to enforce any security rights and that Defendants are barred from enforcing unconscionable and illegal interest rates on sham loans.

211.     Under controlling New York law, the MCA Agreements are void *ab initio*. *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 2021 LEXIS 2206, 2021 Slip Op. 05616, 2021 WL 4777289 (N.Y. Oct. 14, 2021).

## FOURTH CAUSE OF ACTION
### (Fraud)

212.    Plaintiffs repeat and re-allege each of the above allegations.

213.    Each of the MCA agreements contained an appendix setting forth sham fees chargeable to Plaintiffs.

214.    The Defendants improperly deducted an "Origination Fee" to cover cost of origination and ACH Setup. This fee was fraudulent as it was simply a ploy to extract additional funds from the Plaintiffs and did not actually comprise of related expenses pertaining to origination. None of these fees had any relationship to any services actually rendered and instead were disguised interest charges.

215.    The Defendants also deducted an Underwriting Fee for underwriting and related expense. This fee was fraudulent as this was simply a sham to extract more funds from the Plaintiffs. None of these fees had any relationship to any services actually rendered and instead were disguised interest charges.

216.    Defendants also deducted additional fees as set forth in the MCA Agreements which were similarly a fraudulent ploy to extract funds from the Plaintiffs by using a sham misnomer characterization of fees.

217.    The MCA agreements represented that these fees were for services or costs purportedly provided by or incurred by the Enterprise MCA Companies in connection with their respective agreements, but, in reality, these services or costs were never provided or incurred or were otherwise provided or incurred for amounts far below those stated in the MCA agreements and the so-called "fees" were nothing more than additional profits reaped by the Enterprise MCA Companies under the MCA agreements.

218.    For example, each of the MCA agreements provided for an "Underwriting Fee"

in order "to cover Underwriting and related expenses." However, the Enterprise MCA companies performed little or no due diligence and conducted very little underwriting when entertaining into the MCA agreements.

219.    The Enterprise MCA companies would require little more than the completion of an online application and a few months of bank statements and would approve advances to Plaintiffs in a matter of hours.

220.    Each Enterprise MCA company knew that their representations concerning the nature and purpose of the various fees were false and misleading at the time they entered into the MCA Agreements.

221.    These false representations were made in order to induce Plaintiffs into believing that the fees charged to Plaintiffs and deducted from the Purchased Amount of the MCA Agreements were legitimate fees charged to offset the costs of services provided by the Enterprise MCA companies under the MCA Agreements.

222.    Plaintiffs reasonably relied upon these representations in entering into the MCA Agreements and, ultimately paying, the fees.

223.    The respective Defendants have demonstrated a fraudulent scheme. By reason of the foregoing, Plaintiffs are entitled to a judgment against each of Defendants in the amount of all monies paid to each Defendant.


**FIFTH CAUSE OF ACTION**
**(In the alternative, Breach of Contract)**

224.    Plaintiffs repeat and re-allege each of the above allegations.

225.    Under each of the MCA agreements, Defendants promised to advance certain amounts as identified in each of the MCA agreements.

226.    Defendants did not advance the amounts as promised.

227.    As a direct and proximate result of Defendants' breach of each of the MCA agreements, Plaintiffs have been damaged in the amounts described in detail above.

228.    In the event that the Court finds that each of the MCA agreements are valid and enforceable and not void *ab initio* as a matter of law, then Plaintiffs are entitled to direct and consequential damages caused by Defendants' breach of each of the MCA agreements.


## SIXTH CAUSE OF ACTION
### (42 U.S.C. § 1983)
**(Against Defendants Wynwood, Gross, and Teitelbaum, and Against MCA Receivables and Getter)**

229.    Plaintiffs repeat and re-allege each of the above allegations.

230.    In response to New York's prohibition against using its confession of judgment statute and related judgment collection procedures against out-of-state residents, Defendants knowingly and purposely devised a scheme to deprive out-of-state residents from their constitutional right to due process under the Fourteenth Amendment of the United States Constitution by abusing the state laws of Connecticut.

231.    In particular, Defendants, who are located in and reside in Miami, Florida, and in Brooklyn, New York, respectively, devised a scheme where they would fraudulently use a Connecticut address, and/or contractual terms applying Connecticut law in order to avail themselves of Connecticut's prejudgment attachment statute.

232.    The statute, Conn. Gen. Stat. § 52-278(f), is unconstitutional as used by Defendants.

233.    In their form, contracts of adhesion, Defendants require merchants, such as here, to consent to the jurisdiction of two different states, Connecticut and New York, even though

Connecticut has nothing to do with the transaction or parties.

234.    In addition, Defendants include a form "Prejudgment Remedy Waiver," requiring merchants to waive "all rights to notice and prior court hearing or court order in connection with any and all prejudgment remedies…"

235.    Then, when the merchant fails to pay for any reason at all, even in the event of a good-faith dispute, such as here, Defendants employ the prejudgment attachment mechanism of § 52-278(f) by serving a Writ of Attachment on the merchant's bank account *before the filing of a complaint and before serving the merchant.*

236.    In order to utilize its prejudgment attachment remedies, § 52-278(f) provides: "(1) *the complaint shall set forth a copy of the waiver*; (2) *the plaintiff shall file an affidavit* sworn to by the plaintiff or any competent affiant setting forth a statement of facts sufficient to show that there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater than the amount of the prejudgment remedy sought, taking into account any known defenses, counterclaims or set-offs, will be rendered in the matter in favor of the plaintiff; and (3) the *plaintiff shall include in the process served on the defendant a notice satisfying the requirements of subsections (b) and (c) of section 52-278e*."

237.    These requirements are also plainly spelled out on the court's practice guide:

**II.   PJR When Defendant In Commercial Transaction Has Waived Notice And Hearing (Section 52-278f of the Connecticut General Statutes) - Documents Required**

**Note:**  These documents must be served on the Defendant.  After service on the Defendant, these documents must be returned electronically to the Court in accordance with the E-Services Procedures and Technical Standards.

  A.   A *Notice of Ex Parte Prejudgment Remedy/Claim for Hearing to Dissolve or Modify* (form JD-CV 55) may be used to meet the requirement of notice in Section 52-278f of the Connecticut General Statutes.

  B.   Signed complaint that includes a copy of the waiver

  C.   Affidavit by the plaintiff or another person who know the facts personally containing a statement of facts that show probable cause that a judgment in the amount of the prejudgment remedy being asked for, or in an amount greater than the amount of the prejudgment remedy being asked for after considering any known defenses, counterclaims or set-offs, will be rendered in the matter for the plaintiff.

238.    Instead of complying with the letter and spirit of the protections afforded by § 52-278(f), Defendants instead, like here, fire first and ask questions later.

239.    Specifically, Defendants ***do not*** (1) draft and serve a complaint providing notice to the merchant of its claims; (2) rely upon an affidavit setting forth the facts sufficient to show probably cause; or (3) provide notice to the merchants satisfying subsections (b) and (c) of section 52-278e."

240.    Rather than comply with the dictates of § 52-278(f), Defendants first freeze the merchant's bank accounts by serving writs of attachment on the bank only, and then immediately demand a settlement under duress and the threat of financial ruin, and only then proceed to court if the extortion attempt fails.

241.    By abusing § 52-278(f), Defendants knowingly and intentionally deprive their merchants of their constitutional due process rights by freezing bank accounts and not even knowing how the bank account was frozen or where to go to seek protection.

242.    For example, here, Defendants MCA Receivables and Getter froze Inventory's New York bank account by serving a writ of attachment on a Connecticut branch of TD Bank on

or about December 9, 2022.

243.     No notice was provided by Defendants before, during or after TD Bank froze the account. Instead, Inventory had to proactively reach out to TD to understand what had occurred. Upon information and belief, the papers served on TD Bank did not include a copy of a complaint identifying the grounds for the claims asserted by Defendants.

244.     Plaintiffs did not voluntarily and intelligently waive their due process rights. *See D.H. Overmyer Co., Inc. v. Frick Co.*, 405 U.S. 174, 31 L. Ed. 2d 124, 92 S. Ct. 775 (1972).

245.     Rather, Plaintiffs and those similarly situated, (1) were not represented by legal counsel; (2) are unsophisticated business persons; (3) did not have any prior pending actions against them by Defendants; (4) did not have a fair balance of bargaining power;

(5) did not negotiate the terms at arms-length; and (6) were knowingly and intentionally taken advantage of by Defendants due to their financial duress.

246.     Defendants knowingly and intentionally deprived Plaintiffs of their due process rights and had no good-faith basis to believe their actions were lawful under the color of state law. *See Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250 (3d Cir. 1994).

247.     As a direct and proximate cause of Defendants' knowing and intentional violation of 42 U.S.C. § 1983, Plaintiffs suffered damages by, among other things, not being able to pay for their usual business expenses.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants, and seek an order from the Court:

    a)    Certifying this case as a class action on behalf of the Classes defined above, appointing Plaintiffs as Class representatives, and appointing their attorneys as class counsel;

b)      Declaring that the Agreements entered into between Class Members and Defendants constitute a loan transaction, and thus, are void because each intended to charge and receive a criminally usurious interest rate in excess of 25%;

c)      Declaring that the settlement agreements entered into between Class Members and Defendants are void because they were obtained in violation of the Hobbs Act, 42 U.S.C. § 1983, and under threats of financial duress;

d)      Ordering Defendants to repay all principal and interest previously paid to Defendants in connection with the criminally usurious loans, including prejudgment interest;

e)      Granting an injunction against Defendants permanently enjoining them from enforcing any of their rights under the criminally usurious loans;

f)      Awarding the Plaintiffs and Class Members direct and consequential damages;

g)      Awarding Plaintiffs and the Class Members treble damages;

h)      Awarding Plaintiffs and the Class Members their attorney's fees and costs incurred in this action; and

i)      Granting such other and further relief as this Court deems just and proper.

Dated: Fresh Meadows, New York
            December 13, 2022

_____/s/ Jonathan E. Neuman_____
JONATHAN E. NEUMAN, ESQ.
*Attorney for Plaintiffs*
176-25 Union Turnpike, Suite 230
Fresh Meadows, New York 11366
(347) 450-6710
(718) 228-3689 *facsimile*
jnesq@jenesqlaw.com